Wilma Brunel v. SSA          CV-00-402-B        01/07/02

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Wilma Brunel

        v.                              Civil No. 00-402-B
                                        Opinion NO. 2002 DNH 009
JoAnne Barnhardt, Commissioner,
Social Security Administration

MEMORANDUM AND ORDER

Wilma Brunel applied for Title II Social Security Disability Insurance Benefits on January 9, 1996, alleging an inability to work since October 1, 1995. The Social Security Administration ("SSA") denied her application initially and on reconsideration. Administrative Law Judge ("ALJ") Frederick Harap held a hearing on July 2, 1996, and subsequently issued a decision in which he concluded that Brunel was not disabled. The Appeals Council denied Brunel's request for review, and she appealed the ALJ's decision to this court. On January 26, 1999, Judge Devine issued an order reversing the Commissioner's decision and remanding the

case for further proceedings.  The Appeals Council vacated the ALJ's initial decision and remanded the case to him.  On July 22, 1999, ALJ Harap held another hearing and, on August 21, 1999, he issued a second decision in which he concluded that Brunel was not disabled.  The Appeals Council affirmed ALJ Harap's decision on July 6, 2000, thus rendering it the final decision of the Commissioner of the SSA.  20 C.F.R. §§ 404.984(a), 416.1484(a) (2001).

Brunel brought this timely action seeking review of the Commissioner's denial of her application for benefits.  See 42 U.S.C. § 405(g) (1994 & Supp. V 1999).  Before me are Brunel's Motion for Order Reversing the Decision of the Commissioner or for Other Relief, (Doc. No. 6), and the Commissioner's Motion for Order Affirming the Decision of the Commissioner, (Doc. No. 7).  For the reasons set forth below, I conclude that the ALJ improperly acted as a medical expert and concomitantly failed to account adequately for certain non-exertional limitations of which Brunel plausibly complained.  I thus reverse the Commissioner's decision and, remand for further proceedings.

## I. BACKGROUND

The relevant procedural and factual background of this case, which is largely derived from the joint statement of material facts provided by the parties, is as follows:

### A. Procedural History

Brunel filed an application for disability insurance benefits on January 9, 1996. She alleged an inability to work since October 1, 1995, due to venous stasis.[1] After the SSA denied Brunel's application initially and on reconsideration, Brunel requested a hearing before an ALJ. On July 2, 1996, ALJ Harap held a hearing at which Brunel, represented by counsel, appeared and testified. On August 8, 1996, ALJ Harap denied Brunel's application, finding that Brunel was not disabled during the relevant period because she had the ability to perform sedentary work[2] with a sit/stand option, and thus could perform a

---

[1] Venous stasis is a cessation or impairment of venous flow. Dorland's Illustrated Medical Dictionary 1573-74 (28th ed. 1994).

[2] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools. Although a sedentary job is one that involves sitting, a certain amount of walking and standing is often necessary. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria

-3-

significant number of jobs in the national economy.

On April 25, 1997, the Appeals Council denied Brunel's request for review of the ALJ's decision, thus rendering the ALJ's decision the final determination of the Commissioner. Brunel then filed a timely action in this court, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). On January 26, 1999, Judge Devine vacated the decision and remanded for a consultation with a vocational expert ("VE") as to the availability of sedentary jobs that allow alternating between sitting and standing to the extent required by Brunel. The Appeals Council subsequently remanded the case back to ALJ Harap for further proceedings consistent with Judge Devine's order.

On July 22, 1999, ALJ Harap conducted a second hearing at which Brunel, who was again represented by counsel, and VE Catherine Chandick appeared and testified. On August 21, 1999, the ALJ again denied Brunel's application for benefits. In his decision, the ALJ found that the plaintiff was disabled as of September 1997 when she turned fifty years old, but that she was not disabled from October 1, 1995 to August 31, 1997 because she

_____

are met. 20 C.F.R. § 404.1567(a) (2001).

retained the residual functional capacity ("RFC")[3] to do a reduced range of sedentary work, which in turn permitted her to perform a significant number of jobs in the national economy. Brunel then filed the present action for review of the Commissioner's decision.

## B. Summary of Facts

Brunel was a forty-eight year old high school graduate when she filed her application for benefits. Between 1990 and 1995, Brunel worked as a school cafeteria worker and an electronics assembler. Brunel reported that she stopped working on July 18, 1995, primarily because of a vascular condition which caused her leg to swell and become numb.

### 1. Medical Evidence

In May 1995, Brunel's treating physician, Dr. Kenneth E. Ness, referred her for evaluation of chronic venous disease of her lower extremities, more pronounced on the left than the right. Brunel reported that she had experienced asymmetric leg swelling since she was a teenager, but did not have any history

---

[3] Residual functional capacity is what the claimant can do despite her impairments. 20 C.F.R. § 404.1520(e) (2001).

of trauma or phlebitis.[4]  Brunel reported that, initially, there had been no discomfort associated with the swelling (which would decrease with elevation), but that the swelling had recently worsened with a change in her job duties requiring long periods of standing.

Dr. Ness requested a bilateral venous ultrasound because of Brunel's complaints of recurrent swelling of the left leg for many years and swelling of the right leg over the previous two weeks.  The ultrasound showed that the deep venous structures had a normal appearance and compressibility, and did not indicate any evidence of deep venous thrombophlebitis.[5]

On May 25, 1995, an examination by an unidentified doctor showed that Brunel had edema[6] of her left leg with pitting at the

_____

[4]     Phlebitis is an inflammation of a vein.  Dorland's Illustrated Medical Dictionary 1279 (28th ed. 1994).

[5]     Thrombophlebitis is inflammation of a vein associated with thrombus formation.  Thrombus is an aggregation of blood factors, primarily platelets and fibrin with entrapment of cellular elements, frequently causing vascular obstruction at the point of its formation.  Dorland's Illustrated Medical Dictionary 1707-08 (28th ed. 1994).

[6]     Edema is the presence of abnormally large amounts of fluid in the intercellular tissue spaces in the body.  Dorland's Illustrated Medical Dictionary 528 (28th ed. 1994).

ankle, much more pronounced on the left than on the right. Brunel was diagnosed as having a congenital absence of superficial vein valves resulting in chronic edema from venous hypertension, and it was recommended that the leg be compressed and elevated "as much as possible." Brunel reported that an over-the-counter compression stocking she had used in the past made the situation worse if anything, and it was recommended that she have fitted stockings made for both legs.

On July 20, 1995, Brunel went to the New London Hospital emergency room with complaints of swelling in the left leg with a hard, painful vein since the previous day, and left facial numbness since that morning. Observations showed no significant phlebitis or significant tenderness in the calf, inner-thigh, or groin. Magnetic resonance imaging ("MRI") of the left leg did not show any evidence of deep venous thrombosis, and all veins appeared easily compressible and lacking defined clots. A July 29, 1995 MRI, taken to rule out a ruptured cyst at the posterior of the knee, was normal.

By October 1, 1995 (Brunel's alleged onset date), Dr. Ness reported that Brunel was working two to three hours a day as a

caregiver, and that her legs were swollen and uncomfortable.  At the July 2, 1996 hearing, Brunel testified that the caregiving involved visiting an elderly neighbor with a broken hip for two or three hours a day, cleaning the house, watering plants, and doing some grocery shopping.  Brunel received less than $100.00 in total for the assistance she provided.

On November 20, 1995, Brunel visited the New London Hospital emergency room complaining that, in the weeks prior to her visit, the sole of her left foot had become tender to the touch and painful to walk on.  Dr. Finer examined Brunel and found that her toes and left foot were puffy; that the sole of her left foot was tender without crepitus, warmth, or redness; and that most of the tenderness involved deep callouses or plantar warts.  X-rays of the foot showed degenerative change of the intraphalangeal joint in the big toe and mild hallux valgus.[7]

On November 26, 1995, Brunel called Dr. Ness's office and reported that her left foot was not improving.  She felt as though she were walking on "sharp stones."  Dr. Ness examined her

---

[7]    Hallux valgus is angulation of the great toe away from the midline of the body, or toward the other toes.  Dorland's Illustrated Medical Dictionary 730 (28th ed. 1994).

-8-

the next day and found that she had multiple plantar warts. He prescribed Compound W (an over-the-counter wart treatment) and referred her to a podiatrist.

In a letter dated December 22, 1995, Dr. Ness reported that Brunel's venous stasis of the lower extremities caused pain and swelling in her legs if she was required to stand or sit for more than a few hours. Dr. Ness stated in the letter that he was "not convinced that [Brunel] is disabled for all forms of work, but she has been actively looking for a job that she can tolerate" and "has not been successful." Dr. Ness concluded by saying that "[u]ntil someone can help her find gainful employment that does not make her pain and swelling worse, I feel that she should be considered totally disabled."

On January 9, 1996, Brunel filed her application for Social Security disability insurance benefits. As noted above, Brunel alleged an inability to work since October 1, 1995 due to venous stasis. Brunel stated that her condition kept her from working because sitting, standing, or walking for more than two or three hours was very hard, she tired quickly, and had difficulty concentrating. In her application, Brunel reported that she was

required to elevate her legs above heart level to reduce swelling and pain, and that her doctor had told her that she needed to change her regular job. Brunel noted that she did most of the cleaning and shopping at home because her husband is disabled, but that she took frequent rests as she completed the tasks and put her legs up after doing them. She indicated that on "good" days she did her regular household chores, which included cooking, cleaning, washing dishes, and doing laundry with rest periods. But on "bad" days, Brunel did "next to nothing." Brunel also reported that she cooked approximately 10 homemade meals per week.

Brunel stated that, because of her husband's disability, she shoveled the snow from their walkway during the winter for about 10 minutes at a time and then rested for 30 minutes. Brunel traveled outside of her home "frequently," either driving or walking. Generally, she went to her doctor, the bank, post office, and stores, or to visit her parents, friends, and neighbors. Brunel went grocery shopping once a week and to a discount store about once every six weeks, needing help only if something was heavy or down on the floor.

Having undergone a hysterectomy, Brunel was on hormonal replacement therapy, which consisted of taking Estrace and Premarin[8] on alternating days. Brunel also reported taking Triam[terene]/HCTZ[9] to cope with fluid retention and an over-the-counter medication, Extra Strength Tylenol, for discomfort in her legs and as a sleep aid.

Dr. Campbell, acting as a consultant for the SSA, reviewed Brunel's medical records from New London Hospital and New London Surgical Associates for the period through November 20, 1995. Based upon these records, Dr. Campbell prepared an assessment of Brunel's physical functional capacity.[10] In his assessment, Dr. Campbell indicated that Brunel's impairments caused exertional limitations in that she could lift and carry only about 10 pounds

---

[8] Estrace is indicated in treatment of vulval and vaginal atrophy associated with menopause. Premarin is used for treatment of moderate to severe vasomotor symptoms, and/or vulval atrophy associated with menopause. Physician's Desk Reference 3258, 3429-32 (55th ed. 2001).

[9] Triamterene/HCTZ is a potassium-sparing diuretic that blocks the reabsorbtion of sodium in the distal convoluted tubules. It is used for the treatment of edema and hypertension. Dorland's Illustrated Medical Dictionary 1739 (28th ed. 1994).

[10] Dr. Campbell's report in the file is dated "1/30/94," but it is apparent that the report was completed on January 30, 1996.

frequently and 20 pounds occasionally. Dr. Campbell stated that, although Brunel could sit or stand for about six hours during an eight-hour work day, it would be beneficial for her to take a brief break every two to three hours to elevate her feet. Other limitations identified in the report included climbing and balancing only occasionally.

On April 5, 1996, Dr. Ness wrote a note in which he reported that Brunel was "affected by pain and swelling whenever she is required to sit or stand for longer periods of time than a few hours." Dr. Ness noted that, other than her venous stasis, Brunel "is physically unimpaired and could be expected to lift and carry up to 20-25 pounds on an occasional basis." But "[t]he problem is that walking, standing, and prolonged sitting cause pain and swelling in her legs which can lead to a deterioration in her underlying medical condition."

On April 12, 1996, Dr. Robert C. Rainie, an SSA consultant, reviewed the medical evidence and completed an RFC assessment of Brunel's ability to perform physical, work-related functions. Dr. Rainie noted that Brunel's venous stasis was a congenital problem, and that the medical record did not show that it had resulted in inflammation of the skin, skin lesions, phlebitis, or

-12-

lymphedema.[11] Dr. Rainie opined that Brunel could lift and carry about 10 pounds frequently and 20 pounds occasionally. Rainie further suggested that Brunel could sit or stand for about six hours during an eight-hour workday, but should wear support stockings and elevate her legs when possible.

On June 19, 1996, Dr. Ness opined about Brunel's ability to perform a variety of day-to-day activities on a sustained basis. Dr. Ness stated that Brunel could sit for "2+" hours continuously and six hours in an eight-hour workday. Dr. Ness also thought that Brunel could stand for up to 20 minutes continuously and two hours in an eight-hour day, and that she could walk 10 to 15 minutes continuously and one to two hours in an eight-hour day. Dr. Ness believed that Brunel could not perform a job which required her to sit or stand for at least six hours in an eight-hour workday without alternating between sitting and standing as necessary. Dr. Ness went on to suggest that Brunel would need to take 15-minute breaks to "elevate her legs" between four or five

---

[11] Lymphedema is chronic unilateral or bilateral edema of the extremities due to accumulation of interstitial fluid as a result of stasis of lymph, which is secondary to obstruction of lymph vessels or disorders of the lymph nodes. Dorland's Illustrated Medical Dictionary 968 (28th ed. 1994).

times on a "good" day, and eight or more times on a "bad" day, but he did not elaborate on the degree of elevation Brunel required in order to obtain relief. Dr. Ness indicated that his recommendations were "somewhat arbitrary," but that a program of this type seemed "reasonable" to him on the whole.

On May 5, 1997, Brunel saw Dr. Ness for a routine physical and complained of a slight backache after recent yard work. She continued to be bothered by left foot pain and edema. On May 23, 1997, Brunel complained of back pain and increased swelling in her left leg after driving in a small vehicle. Her cholesterol level was 350. Dr. Ness prescribed medication for Brunel's cholesterol, obesity, and back pain. On June 26, 1997, Brunel reported that she had not purchased her cholesterol medication due to cost; that she had stopped taking her obesity medication because of heart palpitations; and that her back spasms were not painful enough to require her to take the prescribed medication. Brunel requested a referral to a specialist "to support her disability" and phlebitis.

On July 28, 1997, Brunel told Dr. Ness that she had stopped taking her cholesterol medication after one week because of

flushing.  Dr. Ness noted that swelling continued in both of Brunel's ankles, more so on the left.  Dr. Ness also noted that a venous doppler ultrasound was normal and that another test, a bilateral photoplethysmography,[12] showed no evidence of venous valvular insufficiency in the right foot.  Dr. Ness further noted that the test was unreliable on the left foot due to Brunel's inability to flex that foot.

On August 18, 1997, Brunel saw Dr. Jack L. Cronenwett, a vascular surgeon, on referral from Dr. Ness.  Dr. Cronenwett noted that Brunel had non-pitting milky edema on her left leg from the knee to the ankle with minimal involvement of the thigh or foot, and very mild edema on the right leg.  Dr. Cronenwett reported that Brunel's recent tests did not show venous reflux or venous valvular incompetency in either leg.

Cronenwett diagnosed relatively classic primary lymphedema in the left leg, and perhaps mild lymphedema in the right.  Dr. Cronenwett opined that intermittent pneumatic compression using a

_____

[12]    Plethysmography is a recording of the changes in the size of a part as modified by circulation of the blood in it. Dorland's Illustrated Medical Dictionary 1306 (28th ed. 1994).

Lympha press[13] would be beneficial, and that Brunel might be more tolerant of wearing support stockings during the day if she used the Lympha press at night and "intermittently during the day." Dr. Cronenwett stated that Brunel's lymphedema had "increased in severity and no longer responds to more conservative treatment such as elevation, diuretic therapy, or custom support stockings." He stated that she was "at the point where she [could not] work, and [would] become disabled unless more effective treatment" was provided to her. In a letter to Keene Medical Products, Cronenwett stated that intermittent use of the Lympha press "will relieve her symptoms sufficiently that she will be able to continue to work," and that "[i]ntermitted pneumatic compression is a recognized effective treatment for this degree of lymphedema and I believe that it will prevent future medical complications."

## 2. Brunel's Testimony

At both hearings, Brunel's attorney questioned her about the

---

[13] At the July 22, 1999 hearing, Brunel described the Lympha press as a large boot attached to a computerized pump. The boot is put on the leg to push fluid from the leg back into the rest of the body. Tr. at 179.

degree of elevation she required in order to obtain relief, and how her daily activities were impacted by pain and swelling. At the July 2, 1996 hearing, Brunel testified that she was required to "get [her] leg up higher than [her] heart" to alleviate pain and swelling. Brunel further testified that elevating her leg on a chair or box is ineffective and "sometimes it hurts more." Brunel stated that her leg would swell and become painful if she was required to sit for longer than 30 minutes. Brunel explained that she was able to do housework and laundry, but needed to rest if she was on her feet for as little as an hour. She stated that it was difficult to wear shoes and clothes when her leg was swollen, and that on some days she was barely able to get out of bed.

At the July 22, 1999 hearing, Brunel testified about how the use of the pneumatic compression device affected her daily activities. Brunel stated that the "medical supply people" advised her to use the device for two hours at a time to get the maximum benefit. Brunel testified that she used the device several times a day, and that doing so required her to lie down on an unscheduled basis with no clothing on her left leg. When

cross-examined by the ALJ, Brunel stated that she used the device for two-and-a-half to four hours in an eight-hour time period.

### 3. **Vocational Expert Testimony**

VE Catherine Chandick testified at Brunel's second hearing before ALJ Harap on July 22, 1999. Ms. Chandick observed that Brunel's past work as an electronics assembler was semi-skilled, sedentary to medium-level work, and that her work as a school cafeteria worker was unskilled, light to medium-level work. Using a hypothetical scenario, the ALJ asked Ms. Chandick whether these jobs could be performed by an individual under 50 with a high school education and Brunel's past work experience if that individual was limited to sedentary work that did not require more than occasional climbing or balancing and allowed for a sit/stand option. Ms. Chandick replied that such a person could not work in a cafeteria, but could perform the electronics assembly job if it were sedentary. However, Ms. Chandick qualified this testimony by observing that such a person could not do the electronics assembly job if it was performed in the way Ms. Brunel described it, at the light to medium-level.

-18-

Ms. Chandick further testified that there were jobs that could be performed by a person of Brunel's age, education, and work experience who was limited to sedentary work that did not require more than occasional climbing or balancing and permitted a sit/stand option. Such a person could work in small-product assembly jobs, production-inspection jobs, sedentary security-guard positions, sedentary cashier positions, and information clerk positions in a mall. Ms. Chandick noted that there were more than 863,500 of these jobs nationally.

Ms. Chandick further opined that, even if one needed to keep her feet "elevated," she could still perform the sedentary security-guard, cashier, and information clerk positions, and that there are more than 700,000 of these jobs nationally. On cross-examination, Ms. Chandick conceded that there were no jobs that a person could perform if she needed to lie down with her feet elevated above her heart for two-and-a-half to four hours in an eight-hour time period. Nor were there jobs that permitted a person to take 15-minute breaks six to eight times a day. Ms. Chandick concluded by agreeing with Brunel's counsel that there were no jobs that a person of Brunel's age, background, and

expertise could perform if she needed to elevate her feet above heart level while working.

### 4. The ALJ's Ruling

The ALJ applied the five-step sequential evaluation process under which disability applications are reviewed. See 20 C.F.R. § 404.1520. The ALJ concluded that Brunel had carried her burden at each of the first four steps in the process, but that Brunel was "not disabled" because the Commissioner had established that, from October 1, 1995 to August 31, 1997, there were jobs in the national economy that Brunel could perform. See 20 C.F.R. § 404.1520(f) (summarizing the showing the Commissioner must make at step five). Specifically, the ALJ found that, although Brunel had severe impairments, including chronic venous stasis, lymphedema, and obesity that precluded a return to her former employment, she retained the RFC during the relevant period "for the full range of sedentary work with only occasional climbing and balancing, the option to alternate positions between sitting and standing, and the option to have her lower extremities elevated straight out while seated as needed or desired." Moreover, while conceding that Brunel's impairments "can be

reasonably expected to result in pain and swelling," the ALJ, without meaningful elaboration, stated that Brunel's allegations of pain and swelling were "not entirely credible" and went on to apply Rules 201.21 and 201.22 of the Medical-Vocational Guidelines ("the Grid"). The ALJ found that, because Brunel had an exertional capacity for sedentary work, and given Brunel's age, education, and work experience, Brunel was "not disabled between October 1, 1995 and August 31, 1997." 20 C.F.R. Pt. 404, Subpt. P, App. 2 at 202.21 (2001).

In reaching his conclusions, the ALJ rejected the opinion of Brunel's treating physician, Dr. Ness, that, as of June 19, 1996, Brunel needed to take 15-minute breaks to elevate her legs "8+" times on a bad day and "4-5X" on a good day. He did so because he regarded this opinion as "contradicted" by Dr. Cronenwett's conclusion that conservative treatments such as elevation were no longer working. Nevertheless, reasoning in the alternative, the ALJ further concluded that, even if Dr. Ness was correct about the required frequency of elevation, Brunel could elevate her legs "straight out while seated" and thus alleviate her symptoms while continuing to work.

-21-

## II. DISCUSSION

### A. Standard of Review

After a final determination by the Commissioner denying a claimant's application for benefits, and upon timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C. § 405(g). My review is limited in scope, however, because the ALJ's factual findings are conclusive if supported by "substantial evidence." See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). While the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to the experts," Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam), I must defer when the ALJ has reasonably settled a credibility issue, drawn an inference from the record evidence, and resolved a conflict in the evidence, see Irlanda Ortiz, 955 F.2d at 769. In the end, I must "uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record

as a whole, could accept it as adequate to support [the ALJ's] conclusion," id. (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted), even where the record can be construed to support another conclusion, see Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

### B. The Social Security Act

#### 1. General Principles

In relevant part, the Social Security Act (the "Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (1994 & Supp. V 1999). As noted above, the Act directs the ALJ to apply a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520. At step four of the process, the ALJ must determine whether the claimant's impairment prevents her from performing her past work. See 20 C.F.R. § 404.1520(e). To make this determination, the ALJ must assess

-23-

both the claimant's RFC, that is, what the claimant can do despite her impairments, and the demands of the claimant's prior employment. See id.; Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991) (per curiam). The claimant bears the burden of showing that she does not have the RFC to perform her past relevant work. See Santiago, 944 F.2d at 5.

If the claimant makes such a showing, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam). The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial, gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

Although an ALJ should ordinarily be entitled to rely on claimant's counsel to structure and present the claimant's case in a way that adequately explores the claims, "the ALJ is responsible in every case to ensure that an adequate record is

-24-

developed during the disability hearing consistent with the issues raised." Hawkins v. Chater, 113 F.3d 1162, 1164, 1167 (10th Cir. 1997). This duty to develop the record is heightened where the claimant is not represented by counsel, but applies in all cases. See 20 C.F.R. § 404.1512(d) (2001). Thus, an ALJ cannot leave the record undeveloped where a "claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where it is within the power of the administrative law judge, without undue effort, to see that the gaps are somewhat filled . . . ." Heggarty, 947 F.2d at 997 (citation and internal quotation marks omitted); see also Thompson v. Sullivan, 987 F.2d 1482, 1492, (10th Cir. 1993) (citation omitted). The duty has been described as one of inquiry, requiring the decision maker "to inform himself about facts relevant to his decision and to hear the claimant's own version of those facts." Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J. concurring).

In deciding whether an ALJ has fully developed the record, the most important inquiry is not the length or brevity of the hearing, but "whether [sufficient questions were asked] to

ascertain (1) the nature of the claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities." Thompson, 987 F.2d at 1492 (citation and internal quotation marks omitted). Importantly, "the absence of evidence is not evidence" sufficient to support a step-five finding that a claimant is not disabled. See id. at 1491.

### 2. Determining a Claimant's RFC

The ALJ is responsible for determining a claimant's RFC. See 20 C.F.R. § 404.1546 (2001). In doing so, the ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities. See SSR 96-8p, 1996 WL 374184, at *3 (1996); see also Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984) (holding that the ALJ's findings on a claimant's RFC were insufficient where the ALJ determined the claimant's RFC in a conclusory manner without a function-by-function assessment). In making his RFC determination, the ALJ must "consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or

disability testified to by the claimant or others." Ferraris, 728 F.2d at 585; see also 20 C.F.R. § 404.1545(a) (2001) (stating that the RFC must be based on all relevant evidence). The ALJ is not free to simply ignore relevant evidence in the record, especially when that evidence supports a claimant's cause. See Nguyen, 172 F.3d at 35. Moreover, the ALJ must specify the evidentiary basis for his RFC determination. See White v. Sec'y of Health & Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (noting that the failure to specify a basis for the RFC determination is a sufficient reason to vacate a decision of the Commissioner); SSR 96-8p, 1996 WL 374184, at *7.

## C. Brunel's Arguments

Brunel contends that she was disabled during the relevant time period because there were no jobs in the national economy that would accommodate her need to take frequent breaks during the workday to elevate her legs above her heart. The ALJ rejected Brunel's argument for two reasons. First, he concluded that Brunel did not need to elevate her legs at all because elevation would not benefit her medical condition. Alternatively, he determined that if Brunel needed to elevate her legs

during the workday, she could do so by extending her legs straight out from a seated position. He then reasoned that since jobs existed in the national economy that would accommodate this non-exertional limitation, Brunel was not disabled. Neither argument is supported by substantial evidence.

First, the record does not support the ALJ's decision to reject Dr. Ness's opinion that Brunel needed to take frequent breaks during the workday to elevate her legs. The only evidence the ALJ cited to support this conclusion was Dr. Cronenwett's opinion that Brunel's condition had deteriorated to the point that she would not derive any benefit from elevating her legs. The ALJ's reasoning is faulty, however, because he overlooked Dr. Cronenwett's related opinion that Brunel's medical condition had become so serious that she needed to use a Lympha press intermittently during the day. These two opinions are inextricably intertwined. The ALJ cannot accept one without also either accepting the other or offering a principled reason for doing otherwise. His failure to do so is determinitive because the record does not contain any evidence which would support a conclusion that jobs existed in the national economy that would

accommodate Brunel's need to use a Lympha press during the workday. In short, the ALJ cannot determine that Brunel is able to work based on a medical opinion that her condition had deteriorated to the point that she could no longer benefit from elevating her legs without also considering whether the limitations on her ability to work resulting from the determination of her condition rendered her disabled.

The ALJ also erred in his alternative ruling that even if Brunel needed to elevate her legs, she only needed to be able to elevate her legs straight out from a seated position. Brunel presented uncontradicted testimony that the only way to relieve the pain and swelling in her legs was to lie down with her legs elevated above her heart. See Tr. at 47, 50, 178. Although medical professionals, including Drs. Campbell, Rainie, and Ness, stated that Brunel needed to elevate her legs, they did not make clear whether Brunel was required to elevate her legs above her heart. Tr. at 61, 75, 137. At the very least, the ALJ was responsible for developing the record during the disability hearing with respect to this gap in the evidence. See Hawkins, 113 F.3d at 1167; see also Heggarty, 947 F.2d at 997. Instead,

the ALJ listened to Brunel's uncontradicted testimony that she was required to elevate her legs above her heart to alleviate the pain and swelling, read the reports of numerous doctors who found that Brunel was required to elevate her legs, and, without the benefit of any medical testing, then interpreted the medical data himself to conclude that elevation of Brunel's legs straight out while seated would sufficiently alleviate her edema.  This was beyond the ALJ's statutory and regulatory warrant.

## IV.  CONCLUSION

When a court finds that the administrative record is incomplete, a court should generally vacate the Commissioner's decision and remand the matter for further proceedings consistent with the reasoning in its opinion.  See 42 U.S.C. § 405(g); Seavey v. Barnhart, ___ F.3d ___, 2001 WL 1631477, at * 6 (1st Cir. Dec. 27, 2001).  But there are "unusual case[s] in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award . . . benefits."  Id.  In my opinion, it is a close question whether this is such a case.  After all, the October 1, 1995 – August 31,

1997 period for which disability benefits are sought is becoming ever more remote; unless additional medical records are located, the body of medical evidence based on examinations of Brunel conducted during or near this period is obviously closed; and the extant medical and testimonial evidence strongly suggest, if they do not establish, that Brunel was unable to work during this period.

Nonetheless, recognizing the limits of my competence and authority in this area, see generally id., I shall err on the side of caution and decline to hold, as a matter of law, that the Commissioner will be unable to generate substantial evidence that Brunel was capable of working during the relevant time frame. Accordingly, I vacate the judgment denying Brunel benefits and remand this matter to the Commissioner with instructions that she either award Brunel benefits or produce evidence that Brunel was capable of work during the period in question. In so doing, I urge the Commissioner to give this matter her prompt attention, given how long it has been pending.

For the reasons stated, I deny the Commissioner's Motion for Order Affirming the Decision of the Commissioner (document no. 7)

and <u>grant</u>, to the extent just described, Brunel's Motion for Order Reversing the Decision of the Commissioner (document no. 6). The Clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 9, 2002

cc: Peter Marsh, Esq.
    David L. Broderick, Esq.